Filed 7/9/25  In re F.S. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| In re F.S., a Person Coming Under the Juvenile Court Law. | C098348 |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>F.S.,<br><br>Defendant and Appellant. | (Super. Ct. No. CM024018) |

This appeal arises out of a juvenile court transfer hearing under subdivision (a) of Welfare and Institutions Code section 707.[1]  In 2005, when F.S. was 16 years old, he was involved in a gang-related altercation early one morning at a gas station in Chico.  During

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

the altercation, F.S. yelled "Norte" and stabbed two young men with a knife multiple times, resulting in severe and fatal injuries. In 2007, F.S. was tried as an adult (as permitted under former law).[2] A jury found him guilty of first degree murder with a gang special circumstance (Pen. Code, §§ 187, 190.2, subd. (a)(22)) and attempted murder (*id.*, §§ 664/187). The jury also found true allegations that both offenses were committed for the benefit of a criminal street gang (*id*. § 186.22, subd. (b)(1)), and that F.S. personally used a deadly or dangerous weapon, a knife (*id*., § 12022, subd. (b)(1)). In 2022, years after his convictions were affirmed on appeal (2009) and he was resentenced following the filing of a habeas corpus petition (2016), F.S. moved for a transfer hearing to determine whether this case should have been tried in juvenile court rather than adult criminal court. The juvenile court conditionally reversed F.S.'s convictions and sentence and then held a transfer hearing.

On appeal, F.S. challenges the juvenile court's determination that he was properly tried as an adult rather than a juvenile. He claims the juvenile court erred in concluding that transfer of this case to a court of criminal jurisdiction (i.e., adult criminal court) would have been proper had the People moved for such relief prior to trial. F.S. argues reversal is required because the juvenile court applied the wrong legal standard. Alternatively, F.S. contends substantial evidence does not support the juvenile court's ruling, including the court's ultimate finding that transfer to a court of criminal jurisdiction would have been proper because he was not amendable to rehabilitation while under the jurisdiction of the juvenile court. Additionally, F.S. argues that if we affirm the transfer order, the superior court should be required to conduct a new sentencing hearing to consider whether he is entitled to the ameliorative changes in the law that took effect after his original sentence was imposed.

---

[2] See *Manduley v. Superior Court* (2002) 27 Cal.4th 537, 548-550; *People v. Superior Court* (*T.D.*) (2019) 38 Cal.App.5th 360, 367-368.

For the reasons that follow, we affirm the juvenile court's transfer order, vacate the jury's true findings on the gang-murder special circumstance allegation and the gang enhancements, strike the gang registration requirement, and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

*Factual Background*

We take the facts from our prior unpublished opinion in this matter affirming the judgment. (*People v. Siordia* (Apr. 1, 2009, C055282) [nonpub. opn.] (*Siordia*).)

"On October 1, 2005, four friends from school, Brian Semore [victim], [W.C.], [L.G.] and [D.S.], went to parties at an apartment complex known as the Zoo in Chico. Semore drove [D.S.]'s Toyota 4Runner. After [D.S.] was arrested that night for being drunk in public, the others decided to return to Oroville to tell [D.S.'s] father about the arrest.

"Another group of four young males was out drinking in Chico that night: the 16-year-old defendant [(i.e., F.S.)], his brother [M.], [Lopez], and [Garcia]. Early the next morning, [F.S] called [S.J.R.] for a ride. [S.J.R.], in his mid-20's, was a felon on parole; he had associated with the Norteño street gang and had a gang tattoo. He had met [F.S.'s] older brother, [L.], in prison. After picking up [F.S.] and his companions in his Honda, [S.J.R.] stopped at a 76 Union gas station for cigarettes.

"In the early morning hours on the way back to Oroville, the group in the 4Runner stopped at the same gas station for a soda. [W.C.] went inside and encountered [S.J.R.], who asked if he "banged." [W.C.] said no and then his attention was drawn to people confronting Semore in the parking lot outside. [W.C.] left the store and asked Semore what was going on. Semore responded the guys 'were talking crap to me.'

"[J.C.], a college instructor who suffered from insomnia, went to the same gas station in the early morning to visit with his friend who worked there. He saw the Honda and the 4Runner arrive and their occupants confront each other. He recognized [Lopez],

3

a former student, and yelled to him. [J.C.] knew Lopez always wore red and referred to himself as a gangster. Lopez responded by telling his friends, 'let's go.'

"A fight broke out and words were exchanged. During the commotion, [F.S.], who was wearing a red windbreaker, yelled, 'Norte.' He told [W.C.] to get out of the cameras [*sic*] and stabbed him in the chest and the face. [F.S.] told [W.C.] he was going to kill him. [F.S.] then stabbed Semore. Semore collapsed, gasping for breath. Everyone from the Honda, except [F.S.], piled back in the car and took off.[3] [F.S.] ran away, leaving his blood on a pickup nearby.

"[F.S.] ran to [S.J.R.]'s, arriving before the Honda. He had cut his hand and [S.J.R.]'s girlfriend [M.] bandaged it.[4] [F.S.] had a knife covered in blood and told [M.] he had stabbed someone. He was scared and said he would burn his clothes. Both [S.J.R.] and [M.] initially lied to the police; [M.] tried to hide the Honda by moving it to Burney. They told the truth about what happened that night when the police tried to blame [S.J.R.] for the stabbings.

"[W.C.] spent four days in the hospital recovering from his injuries. The police found brass knuckles in his pants pocket. [W.C.] claimed he carried them for protection, but forgot he had them that night.

"Semore had stab wounds to his chest and his back. The stab wounds to his heart were fatal. Some of his wounds indicated multiple thrusts, made without removing the knife from his body. The pathologist opined the cause of death was a combination of

---

[3] "Some of the witnesses testified all of the men got back in the Honda. This version of events was refuted by [F.S.'s] blood on the pickup." (*Siordia*, *supra*, C055282, at p. *1, fn. 2.)

[4] "By the time of trial, [M.] had married [S.J.R.]." (*Siordia*, *supra*, C055282, at p. *2, fn. 3.)

4

sharp-force and blunt-force injuries inflicted with homicidal violence over a period of minutes.

"Detective Michael Nelson, a gang expert, testified about the Norteño criminal street gang in Butte County. [F.S.'s] brothers, [L.], [E.], and [M.] were all documented Norteño gang members. Nelson explained that Norte was an abbreviation for Norteño; it also stood for Northern Organization Raza 'til Eternity. To establish the elements of [the Penal Code] section 186.22, the gang enhancements, Nelson described previous criminal activities of Norteños, including an assault by [F.S.'s] brother [L.]. [F.S.] had committed a gang-related battery.

"In Nelson's opinion, [F.S.] was an active participant in the Norteño criminal street gang. He further opined that [F.S.] killed Semore and attempted to kill [W.C.] to further the Norteño street gang. On redirect examination, in answer to a hypothetical question, Nelson testified that if one, who is wearing red and accompanying known Norteño gang members, gets into a confrontation and yells 'Norte' and stabs one man in the chest saying he will kill him and another in the back and the chest, killing him, he has committed crimes to promote the activities of the gang. He is identifying himself as a gang member and demonstrating his commitment to the gang.

"Detective Matthew Madden testified about his interview with [F.S.].[5] [F.S.] initially denied he was present at the gas station, but later admitted he stabbed Semore and [W.C.] and that he might have said, 'Norte.' [F.S.] felt [W.C.] might have had a gun, so he removed a knife and stabbed him. [F.S.] sliced his hand in opening the knife. He

---

[5] "The interview was recorded, but it was not played for the jury. The prosecutor asked to play the video during the cross-examination of Detective Madden, but the trial court ruled it would be an undue consumption of time." (*Siordia*, *supra*, C055282, at p. *2, fn. 4.)

5

burned his clothes and threw his knife in the river. [F.S.] said he went crazy with the knife and could have stabbed the second victim a thousand times.

"The defense had DNA analysis performed on the brass knuckles in [W.C.]'s pocket and the fabric from his pockets. Blood on the brass knuckles was consistent with [W.C.]'s. There was a stain on his pocket containing a mixture of DNA; neither [W.C.] nor [F.S.] could be excluded as donors." (*Siordia*, *supra*, C055282, at pp. *1-2.)

*Procedural Background*

Although F.S. was only 16 years old at the time he committed the offenses giving rise to this case, the Butte County District Attorney chose to file charges directly in adult criminal court. At that time (2005), the district attorney was permitted to do so. (See *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 305 (*Lara*); former § 707, subds. (b), (d), repealed by Prop. 57, § 4.2.)

In 2007, a jury found F.S. guilty of first degree murder with a gang special circumstance (Pen. Code, §§ 187, 190.2, subd. (a)(22)) and attempted murder (*id.*, §§ 664/187). (*Siordia*, *supra*, C055282, at p. *1.) The jury also found true allegations that both offenses were committed for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)) and that F.S. personally used a dangerous weapon, a knife (*id.*, § 12022, subd. (b)(1)). The trial court sentenced F.S. to life without possibility of parole (LWOP) for the murder, 15 years to life for the attempted murder, and two years for the weapon enhancements. Sentence on the gang enhancements was stayed under Penal Code section 654. (*Siordia*, at p. *1.) We affirmed the judgment in an unpublished opinion issued in 2009 (*Siordia*, *supra*, C055282), and our Supreme Court denied review.

In May 2016, F.S. filed a habeas corpus petition challenging his mandatory LWOP sentence under *Miller v. Alabama* (2012) 567 U.S. 460 [holding a sentencing scheme that mandates LWOP sentences for juvenile offenders violates the Eighth Amendment's prohibition against cruel and unusual punishment] and *People v. Gutierrez* (2014) 58 Cal.4th 1354.

On November 8, 2016, the voters of California approved Proposition 57, the Public Safety and Rehabilitation Act of 2016 (Proposition 57) (Cal. Const., art. I, § 32). It went into effect the next day and applies to all juveniles charged directly in adult criminal court whose judgment was not final at the time it was enacted. (*Lara, supra*, 4 Cal.5th at pp. 303-304.) As relevant here, Proposition 57 eliminated the People's ability to initiate criminal cases against juvenile offenders anywhere but in juvenile court. Instead, it requires the People to commence such actions in juvenile court. If the People wish to try a juvenile as an adult, the juvenile court must conduct a "transfer hearing"[6] to determine whether the matter should remain in juvenile court or be transferred to adult criminal court. During the transfer hearing, the juvenile court considers various factors such as the minor's maturity, degree of criminal sophistication, prior delinquent history, and whether the minor can be rehabilitated. Only if the juvenile court transfers the matter to adult criminal court can the juvenile be tried and sentenced as an adult. Proposition 57 also removed the presumption of unfitness to be tried as a juvenile that previously attached to the alleged commission of certain offenses.[7] (See *People v. Padilla* (2022) 13 Cal.5th 152, 159-160, 166 (*Padilla*); *Lara, supra,* 4 Cal.5th at pp. 303, 305.)

---

[6] Prior to the passage of Proposition 57, the hearing to determine whether a juvenile could be tried as an adult was called a "fitness hearing." Thereafter, courts commonly referred to the hearing as a "transfer hearing." (*Lara, supra*, 4 Cal.5th at p. 306, fn. 4 [noting that § 707, subd. (a)(1), as amended by Prop. 57, refers to a "motion to transfer" the juvenile to adult criminal court].)

[7] "[T]here are key differences between a Proposition 57 transfer hearing and the analogous fitness hearing under prior law. Most notably, Proposition 57 shift[ed] the burden of proof in the hearing. Under prior law, the juvenile court was bound by a rebuttable presumption that the defendant was not fit for the juvenile court system, whereas under [Proposition 57] there is no such presumption. [Citation.] In addition, the court at [the defendant's] fitness hearing could not retain jurisdiction unless it found him fit for juvenile court under all five criteria [(i.e., the statutory factors set forth in section 707]. [Citation.] In a transfer hearing under [Proposition 57 as originally enacted] the

7

Less than two weeks after Proposition 57 went into effect, the superior court granted F.S.'s habeas corpus petition and resentenced him to a term of 25 years to life for the murder, 15 years to life for the attempted murder, and two years for the weapon enhancements. Sentence on the gang enhancements was stayed under Penal Code section 654. No appeal was filed.

More than five years later, in March 2022, F.S. moved for a juvenile court transfer hearing under section 707 to determine whether he was properly tried as an adult rather than a juvenile. The unopposed motion was granted, and F.S.'s convictions and sentence were conditionally reversed pending a determination as to whether the juvenile court would have transferred this case to a court of criminal jurisdiction had the People moved for such relief prior to trial in 2007.[8]

As discussed more fully *post*, Proposition 57 was amended several times after F.S.'s unopposed motion for a juvenile court transfer hearing was granted. (See, e.g., Stats. 2022, ch. 330, § 1, Assembly Bill No. 2361 (2021-2022 Reg. Sess.) (Assembly Bill No. 2361).) Of relevance here, Assembly Bill No. 2361 raised the People's burden of proof on a transfer motion and made clear that the analysis of the five criteria set forth in section 707 should be focused through the lens of the minor's "amenability to

_____

court [was required to] consider all five factors, but ha[d] broad discretion in how to weigh them." (*People v. Garcia* (2018) 30 Cal.App.5th 316, 324-325.)

[8] The Attorney General asserts that F.S.'s request for a transfer hearing was "in effect" a petition for writ of habeas corpus seeking collateral relief. (See *In re A.M.* (2024) 102 Cal.App.5th 557, 564 (*A.M.*) [treating motion to recall remittitur on basis that defendant was entitled to relief under Proposition 57 as a petition for writ of habeas corpus and issuing an order to show cause for the government to demonstrate why relief should be granted on the grounds that the defendant was entitled to a transfer hearing under section 707].) In the proceedings below, the parties stipulated that the juvenile court had the authority to conduct a transfer hearing for the purpose of determining whether F.S should have been tried in juvenile court rather than adult criminal court. Thus, the parties agreed to a conditional reversal of F.S.'s sentence to allow the juvenile court to decide whether he was properly tried as an adult instead of a juvenile.

8

rehabilitation." Effective January 1, 2023, a minor cannot be transferred to a court of criminal jurisdiction unless the juvenile court finds by *clear and convincing* evidence that the minor is *not amenable to rehabilitation* while under the jurisdiction of the juvenile court. (Assembly Bill No. 2361; see § 707, subd. (a)(3), italics added.)[9]

In March 2023, after a hearing that spanned multiple days, the juvenile court issued an order transferring the matter to a court of criminal jurisdiction. In so ruling, the court found by clear and convincing evidence that F.S. would not have been amenable (and was currently not amenable) to rehabilitation while under the jurisdiction of the juvenile court. As a result, the juvenile court ordered the case transferred to a court of criminal jurisdiction and reinstated F.S.'s convictions and sentence.

F.S. filed a timely notice of appeal. The matter was assigned to this panel in February 2025 and fully briefed in May 2025.

## DISCUSSION

### I

### *Transfer Order*

F.S. argues the juvenile court erred in transferring this matter to a court of criminal jurisdiction. He claims reversal is required because the juvenile court applied the wrong

---

[9] As we recently explained: "Under prior versions of [section 707], courts determined whether minors were 'fit and proper subject[s] to be dealt with under the juvenile court law' and considered 'rehabilitation' and 'amenability to care, treatment, and training' as part of the analysis. [Citations.] After Proposition 57 removed the language regarding both fitness and amenability, some courts that had referred to section 707 hearings as 'fitness hearings' began referring to 'transfer hearings.' [Citations.] Now that section 707 makes 'amenab[ility] to rehabilitation' the ultimate determination, juvenile courts would be better served referring to 'amenability hearings.' " (*In re S.S.* (2023) 89 Cal.App.5th 1277, 1288 (*S.S.*), superseded by statute on other grounds as stated in *In re J.M.* (2024) 103 Cal.App.5th 745 (*J.M.*).) In this opinion, we refer to the relevant hearing as a juvenile court transfer hearing to be consistent with the record, although we agree that such hearings are more accurately characterized as "amenability hearings."

9

legal standard. Alternatively, he claims substantial evidence does not support the juvenile court's ruling, including the court's ultimate finding that he would not have been amendable (and was currently not amenable) to rehabilitation while under the jurisdiction of the juvenile court.

A. *Applicable Law and Standard of Review*

Section 707 sets forth the procedures for transferring an individual who committed a crime as a minor from juvenile court to adult criminal court. "It provides that whenever a minor aged 16 years or older is alleged to have committed a felony, the prosecutor may move 'to transfer the minor from juvenile court to a court of criminal jurisdiction.' " (*In re Miguel R*. (2024) 100 Cal.App.5th 152, 164 (*Miguel R*.), citing § 707, subd. (a)(1).) The motion must be made prior to the attachment of jeopardy.[10] After the motion is filed, the probation department prepares "a report on the behavioral patterns and social history of the minor." (§ 707, subd. (a)(1).)

"The Legislature amended section 707 in 2023 and 2024. Effective January 1, 2023, Assembly Bill [No.] 2361 amended section 707[, subdivision] (a)(3) by adding the following italicized language: 'Following submission and consideration of the report, and of any other relevant evidence that the petitioner or the minor may wish to submit, the juvenile court shall decide whether the minor should be transferred to a court of criminal jurisdiction. *In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.* In making its decision, the court shall consider the criteria specified in subparagraphs (A) to

---

[10] Jeopardy attaches when a defendant is placed on trial in a court of competent jurisdiction, on a valid accusatory pleading, before a jury duly impaneled and sworn. (*Curry v. Superior Court* (1970) 2 Cal.3d 707, 712; *Carrillo v. Superior Court* (2006) 145 Cal.App.4th 1511, 1524.)

10

(E), inclusive. If the court orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes, *which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.*' " (*Miguel R., supra*, 100 Cal.App.5th at p. 164; see *S.S., supra*, 89 Cal.App.5th at p. 1294 [explaining that the " 'recite the basis for its decision' " requirement means the juvenile court "should 'explicitly "articulate its evaluative process" by detailing "how it weighed the evidence" and by "identify[ing] the specific facts which persuaded the court" to reach its decision' whether to transfer minor to a court of criminal jurisdiction"]; *ibid.* [noting that the juvenile court's articulation of its evaluative process, like its analysis, "should focus on minor's amenability to rehabilitation"].)

Accordingly, Assembly Bill No. 2361 amended the procedure for transferring a case to adult criminal court in three ways: (1) it raised the prosecution's burden of proof to clear and convincing evidence, (2) it made amenability to rehabilitation while under jurisdiction of the juvenile court "the ultimate question for the court to decide," and (3) it required the juvenile court to state the reasons supporting a finding that the minor is not amenable to rehabilitation. (*In re E.P.* (2023) 89 Cal.App.5th 409, 416.)

The five statutory criteria listed in subparagraphs (A) through (E) of section 707, subdivision (a)(3) were not amended by Assembly Bill No. 2361. (See Stats. 2022, ch. 330, § 1.) Those criteria are: (1) "[t]he degree of criminal sophistication exhibited by the minor"; (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction"; (3) "[t]he minor's previous delinquent history"; (4) "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor"; and (5) "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor." (§ 707, subd. (a)(3)(A)-(E).) The statute sets forth a nonexhaustive list of relevant factors for the court to consider with respect to each of the five criteria. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).) These criteria

11

"are based on the premise that the minor did, in fact, commit the offense." (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 682 (*Jones*); *Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 189 (*Kevin P.*).) The ultimate determination of whether "the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court" (§ 707, subd. (a)(3)) is not the same as the second criterion, which calls for consideration of "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (*id.*, subd. (a)(3)(B)(i)). (See *Miguel R., supra*, 100 Cal.App.5th at p. 166.)

"Effective January 1, 2024, Senate Bill [No.] 545 [(2023-2024 Reg. Sess.)] amended section 707 to require that with respect to each of th[e] five criteria the juvenile court 'shall give weight to any relevant factor,' including the specific factors listed as relevant to each criterion. [Citation.] The previous version of the statute made consideration of those factors discretionary, not mandatory." (*Miguel R.*, *supra*, 100 Cal.App.5th at pp. 164-165.) Senate Bill No. 545 further amended section 707 to specify additional factors that must be considered in determining whether the People have carried their burden of proof to transfer a juvenile to adult criminal court. (See § 707, subd. (a)(3)(A).) Specifically, Senate Bill No. 545 amended the factors the court must weigh in evaluating a minor's criminal sophistication to include "the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery." (§ 707, subd. (a)(3)(A)(ii).) It also amended the factors the court must weigh in evaluating the circumstances and gravity of the offense to include "evidence offered that indicates that the person against whom the minor is accused of committing an offense trafficked, sexually abused, or sexually battered the minor." (§ 707, subd. (a)(3)(E)(iii).) The bill's author explained that the 2024 amendments to section 707 " 'will reduce arbitrary determinations surrounding the transfer of juveniles to adult court by establishing that the court's decision to transfer a juvenile must be based on sufficient evidence. Rehabilitation is the way forward, and that includes giving juveniles who have made a

mistake the opportunity to create a new future as they prepare to reenter our society as adults.' " (Assem. Off. of Chief Clerk, 3d reading analysis of Assem. Bill No. 2361 (2021-2022 Reg. Sess.) as amended Mar. 31, 2022, p. 1; see also *S.S.*, *supra*, 89 Cal.App.5th at pp. 1285-1286.)

The Legislature also recently changed the law as to the length of time a person can remain under the juvenile court's jurisdiction. Previously, the juvenile court retained jurisdiction over a person until they reached age 25, or for a period of two years from the date of their commitment to a secure youth treatment facility, whichever occurred later. (See former § 607, subds. (a)-(c).) Effective September 13, 2023, Senate Bill No. 135 (2023-2024 Reg. Sess.) permits the juvenile court to "retain jurisdiction over a person who is 25 years of age or older for a period not to exceed two years from the date of disposition." (§ 607, subd. (d); see Stats. 2023, ch. 190, § 12.)

"We review the juvenile court's ruling on a transfer motion for abuse of discretion. [Citation.] 'The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' [Citation.] The juvenile court's findings with respect to each of section 707's five criteria are findings of fact reviewed for substantial evidence. [Citation.] In conducting a substantial evidence review, we draw all reasonable inferences in support of the court's findings." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.)

"Likewise, we review for substantial evidence the juvenile court's ultimate finding 'that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' [Citation.] Because the juvenile court must make that finding by clear and convincing evidence, we 'determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by' the clear and convincing evidence standard." (*Miguel R.*,

13

*supra*, 100 Cal.App.5th at p. 165; see *People v. Brown* (2014) 59 Cal.4th 86, 105 [the substantial evidence standard requires the reviewing court to examine the whole record in the light most favorable to the challenged order or judgment to determine whether it discloses evidence that is reasonable, credible and of solid value].)

" 'The standard of proof known as clear and convincing evidence demands a degree of certainty greater than that involved with the preponderance standard, but less than what is required by the standard of proof beyond a reasonable doubt.' [Citations.] ' "Clear and convincing" evidence requires a finding of high probability.' [Citations.] Courts have also described the standard 'as requiring that the evidence be " 'so clear as to leave no substantial doubt'; 'sufficiently strong to command the unhesitating assent of every reasonable mind.' " ' " (*S.S.*, *supra*, 89 Cal.App.5th at p. 1286.)

B.  *Retroactivity of the Amendments to Section 707*

Before turning to the merits of F.S.'s arguments, we first observe that the recent amendments to section 707 apply retroactively to this case.  The amendments have similar ameliorative effects to amendments made to section 707 by Proposition 57, which prohibited the People from charging juveniles with crimes directly in a court of criminal jurisdiction and gave the People the burden of proof at transfer hearings.  (Former § 707, subd. (a)(1), as amended by Prop. 57 (Nov. 9, 2016) § 4.2; Evid. Code, § 500; see *Lara, supra*, 4 Cal.5th at p. 303.)  In *Lara*, our Supreme Court held that those amendments applied retroactively because they effectively reduced the possible punishment for juveniles:  "The possibility of being treated as a juvenile in juvenile court—where rehabilitation is the goal—rather than being tried and sentenced as an adult can result in dramatically different and more lenient treatment." (*Lara*, at p. 303.)  The latest amendments likewise make it more difficult to transfer juveniles from juvenile court, which similarly reduces the possible punishment for juveniles.  Accordingly, we conclude that the current version of section 707 applies retroactively to this case, which is not yet final.  (See *People v. McKenzie* (2020) 9 Cal.5th 40, 45 [presumption of

retroactivity " ' "applies to any such proceeding which, at the time of the supervening legislation, has not yet reached final disposition in the highest court authorized to review it" ' "].) This matter is not "final" because it is pending on direct appeal from the transfer order. (See § 801, subd. (a); *Padilla*, *supra*, 13 Cal.5th at pp. 161-163 [a successful collateral attack on the judgment that results in vacatur of sentence reopens finality for purposes of retroactivity]; *People v. Vieira* (2005) 35 Cal.4th 264, 305-306 [a judgment generally becomes final when all direct appeals have been exhausted and the time for filing a petition for certiorari has expired]; *A.M.*, *supra*, 102 Cal.App.5th at p. 566 [a case becomes nonfinal following a conditional reversal of conviction and sentence in connection with a transfer hearing].)

Here, in 2022, the parties stipulated to an order conditionally reversing F.S.'s convictions and sentence for the purpose of allowing the juvenile court to conduct a transfer hearing to determine whether he should have been tried as a juvenile rather than an adult. On appeal, F.S. challenges the juvenile court's March 2023 ruling that it would have transferred this case to a court of criminal jurisdiction (i.e., adult criminal court) had the People sought such relief prior to the commencement of trial in 2007. In other words, F.S. claims the juvenile court erred in transferring this matter to a court of criminal jurisdiction and reinstating his convictions and sentence. Under these circumstances, the recent amendments to Proposition 57 apply. (See *Padilla, supra*, 13 Cal.5th at pp. 161-163 [when a court vacates a sentence, the judgment in that case becomes nonfinal for purposes of retroactively applying ameliorative laws]; *A.M., supra*, 102 Cal.App.5th at p. 560 ["a judgment becomes nonfinal when a minor defendant sentenced as an adult prior to the electorate's passage of Proposition 57 subsequently has their sentence conditionally reversed on habeas corpus," and "[s]uch a defendant is entitled to the benefit of ameliorative laws enacted since the imposition of their original sentence"].)

15

C. *Legal Standard for Postjudgment Transfer Hearing*

We first address F.S.'s initial contention that the juvenile court committed prejudicial error by applying the wrong legal standard in transferring this case to a court of criminal jurisdiction.

In *Lara*, our Supreme Court considered the appropriate remedy where, as here, a defendant has been tried, convicted, and sentenced before Proposition 57 took effect. There, the high court endorsed the remedy employed by *People v. Vela* (2017) 11 Cal.App.5th 68. (See *Lara, supra*, 4 Cal.5th at pp. 309-313.) In *Vela*, the appellate court ordered as follows: " 'Vela's conviction and sentence are conditionally reversed and we order the juvenile court to conduct a juvenile transfer hearing. [Citation.] *When conducting the transfer hearing, the juvenile court shall, to the extent possible, treat the matter as though the prosecutor had originally filed a juvenile petition in juvenile court and had then moved to transfer Vela's cause to a court of criminal jurisdiction.* [Citation.] If, after conducting the juvenile transfer hearing, the court determines that it would have transferred Vela to a court of criminal jurisdiction because he is 'not a fit and proper subject to be dealt with under the juvenile court law,' then Vela's convictions and sentence are to be reinstated. [Citation.] On the other hand, if the juvenile court finds that it would *not* have transferred Vela to a court of criminal jurisdiction, then it shall treat Vela's convictions as juvenile adjudications and impose an appropriate "disposition" within its discretion.' " (*Vela*, at p. 82, first italics added; see also *Lara, supra*, 4 Cal.5th at p. 310.)

We agree with the Attorney General that the remedy endorsed by our high court in *Lara* applies here. Accordingly, the question before the juvenile court was whether it would have transferred this case to a court of criminal jurisdiction (under current legal standards) had the People moved for such relief prior to the commencement of trial in 2007. (See § 707, subd. (a)(1) [transfer motion "shall be made prior to the attachment of

jeopardy"].)  A review of the reporter's transcript for the transfer hearing shows that the juvenile court properly applied this standard.

We find no merit in F.S.'s contention that the juvenile court erred by evaluating the relevant statutory criteria through a "contemporaneous" lens--that is, by only considering the evidence "as of 2006" in assessing whether he should have been tried as an adult rather than a juvenile.  In support of his position, F.S. notes that the plain text of section 707 is written in the present tense, which (in F.S.'s view) mandates that the evidence submitted in connection with a juvenile court transfer hearing be evaluated "as of the time of the [transfer] hearing" (here, 2023).  But the record makes clear that the juvenile court did *not*, as F.S. suggests, ignore relevant evidence, including evidence about events that occurred after the felony complaint was filed in 2005.  To the contrary, the juvenile court conducted the transfer analysis "using as much reliable information as possible from two distinct temporal perspectives."  In taking this approach, the juvenile court explained as follows:  "Because it appears . . . that there is no precedent that clearly delineates how [the court] must evaluate [F.S.] for transfer after the passage of so much time [(i.e., more than 15 years after he was convicted]), the Court finds that to provide the parties with a complete understanding of the Court's rational and complete record, the Court should conduct the analysis using as much reliable information as possible from two distinct temporal perspectives.  As such, this Court has engaged in analysis under the criteria [set forth in section 707, subdivision (a)(3)(A)-(E)] . . . as if applied at or near the filing of the Complaint *and currently*, considering the passage of time."  (Italics added.)  The juvenile court went on to explain that "[m]uch of that analysis is the same under either perspective," with "the only significant difference of application [being] the factor incorporating a present-day analysis of whether [F.S.] can be rehabilitated prior to the expiration of the juvenile court's jurisdiction."

Although the juvenile court emphasized that it believed the "most logical" approach was to analyze the five statutory criteria "using evidence known about [F.S.]

17

and the offenses contemporaneous to the events" giving rise to the underlying charges,[11] it noted that "the [ultimate] question of whether [F.S.] is amenable to rehabilitation while under the jurisdiction of the juvenile court necessarily takes into consideration [the criterion of whether F.S. can be rehabilitated prior to the expiration of the juvenile court's jurisdiction] and th[e] evidence that's accumulated over the passage of time."

On this record, we see no basis for reversal. The juvenile court employed the correct "remedy" endorsed by our Supreme Court in response to the parties' stipulation for a postjudgment transfer hearing. The court considered the evidence submitted in connection with the transfer request (including expert testimony) and, in reaching its decision, analyzed the relevant statutory criteria using the correct legal standard.

D. *Juvenile Court's Application of the Section 707 Criteria*

Next, F.S. argues the juvenile court erred by failing to "link" its evaluation of the five statutory criteria (§ 707, subd. (a)(3)(A)-(E)) to the ultimate determination of whether he was amenable to rehabilitation while under the jurisdiction of the juvenile court. As we understand it, F.S.'s argument is that the transfer order must be reversed

---

[11] Indeed, as noted by F.S., two of the five statutory criteria--the degree of criminal sophistication exhibited by the minor and the circumstances and gravity of the offense(s) alleged to have been committed by the minor--expressly limit the transfer analysis as to those criteria to the facts that existed at the time of the underlying offense(s). And two of the other criteria--the minor's previous delinquent history and the success of previous attempts by the juvenile court to rehabilitate the minor--typically involve facts that existed prior to the commission of the offense(s) giving rise to the transfer hearing. However, under certain circumstances, this would not be the case. For example, consider a minor who commits a murder when they are 16 years old but is not charged with that crime until they are 20 years old, after they committed additional offenses before turning 18. (See *D.C. v. Superior Court* (2021) 71 Cal.App.5th 441, 445-447 (*D.C.*) .) Under those circumstances, the hypothetical minor's delinquent history would not be limited to conduct taking place before the offense(s) giving rise to the transfer hearing. (See *id.* at pp. 451-456.) Likewise, the criterion regarding the success of previous attempts to rehabilitate this hypothetical minor would not necessarily be limited to events occurring before the offenses giving rise to the transfer hearing.

because the juvenile court's findings were not directed at the ultimate question of amenability. In other words, F.S. claims the juvenile court failed to apply the proper legal standard in ruling on the transfer request. We disagree.

As noted, *ante*, in ruling on a transfer motion, the "ultimate finding" that the juvenile court must make under section 707, subdivision (a)(3) "concerns a global assessment of the minor's suitability to rehabilitation within the juvenile court system." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 167.) Assembly Bill No. 2361's amendments to section 707 were intended to "refocus" the juvenile court's assessment and require "[t]he analysis of the five criteria set forth in the statute [to] be focused through the lens of amenability to rehabilitation." (*S.S.*, *supra*, 89 Cal.App.5th at p. 1288.) Indeed, in making the "ultimate finding" regarding amenability, the plain language of the statute requires the juvenile court to "consider the criteria specified in subparagraphs (A) to (E), inclusive." (§ 707, subd. (a)(3).) "Thus, according to the statute's plain language, the court is required to consider each of the five listed criteria in determining whether the prosecution has carried its burden of proof to transfer a juvenile to criminal court." (*Miguel R.*, at p. 166.) In other words, the statute unambiguously provides that the evaluation of the five specified criteria is the means by which the juvenile court reaches the ultimate determination of whether the minor is not amenable to rehabilitation; amenability is not itself a separate factual finding that supplants the findings regarding the specified criteria.

Here, the record reflects that the juvenile court evaluated each of the five statutory criteria and, based on that analysis, determined that transfer of the matter to a court of criminal jurisdiction was proper because F.S. would not have been (and currently was not) amenable to rehabilitation while under the jurisdiction of the juvenile court. No further finding regarding amenability was required. To the extent F.S. suggests otherwise, we disagree.

19

E. *Substantial Evidence Supports the Transfer Order*

Finally, we are unpersuaded by F.S.'s alternative contention that reversal is required because substantial evidence does not support the juvenile court's transfer order.

As previously indicated, in deciding whether this case should have been transferred to a court of criminal jurisdiction, the juvenile court was required to evaluate the five criteria set forth in subdivision (a) of section 707: (1) the degree of "criminal sophistication" exhibited by F.S.; (2) whether F.S. could be rehabilitated prior to the expiration of the juvenile court's jurisdiction; (3) F.S.'s previous delinquent history; (4) the success (or lack thereof) of previous attempts by the juvenile court to rehabilitate F.S.; and (5) the circumstances and gravity of the offenses alleged to have been committed by F.S. (§ 707, subd. (a)(3)(A)-(E).) Applying these factors, the ultimate question was whether the People demonstrated, by clear and convincing evidence, that F.S. was "not amenable to rehabilitation while under the jurisdiction of the juvenile court." (*Id.*, subd. (a)(3); *Miguel R., supra*, 100 Cal.App.5th at p. 166.) The weight to be given each of the five criteria is within the juvenile court's discretion. (*D.C., supra*, 71 Cal.App.5th at p. 445; see *In re E.P., supra*, 89 Cal.App.5th at p. 417 [the court has the discretion to conclude that one or more of the five factors predominate so as to determine the result, even though some or all of the other factors might point to a different result].)

Next, we consider whether substantial evidence supports the findings in the juvenile court's transfer order, which was issued after that court heard testimony from a number of witnesses (e.g., mental health experts, probation officer) and considered various other materials submitted by the parties and the probation department (e.g., juvenile court transfer hearing report, expert reports). Under the substantial evidence standard of review, our "power . . . *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact." (*Grainger v. Antoyan* (1957) 48 Cal.2d 805, 807.) In making this

determination, we accept all evidence that supports the successful party and draw all reasonable inferences to uphold the challenged order. (*Harley-Davidson, Inc. v. Franchise Tax Bd.* (2015) 237 Cal.App.4th 193, 213.) "[I]t is not our role to reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not disturb the judgment if there is evidence to support it." (*Ibid*.) In applying the substantial evidence standard, we do not review the evidence to determine if there is substantial evidence to support the losing party's (i.e., F.S.'s) position, but only to see if substantial evidence exists to support the challenged order. Thus, we look *only* at the evidence offered in the People's favor and determine if it was sufficient to support the juvenile court's findings as to each of the five statutory criteria. (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245.) If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal for insufficient evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1054.) "As with all substantial evidence challenges, an appellant challenging [a finding of fact] for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal. A reviewing court will not independently review the record to make up for appellant's failure to carry his burden." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266 (*Defend the Bay*).)

As we next explain, substantial evidence supports the juvenile court's transfer order.

### 1. *Criminal Sophistication*

The first statutory criterion is "[t]he degree of criminal sophistication exhibited by the minor." (§ 707, subd. (a)(3)(A)(i).) When evaluating this criterion, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and

21

consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication." (*Id.*, subd. (a)(3)(A)(ii).)

The juvenile court "consider[s] the whole picture, that is, all the evidence that might bear on the minor's criminal sophistication, including any criminal sophistication manifested in the present crime." (*Jones*, *supra*, 18 Cal.4th at pp. 683-684; *Kevin P., supra*, 57 Cal.App.5th at p. 192.) Criminal sophistication can be shown with facts demonstrating an " 'ability to appreciate the risks and consequences of [one's] criminal behavior' and [one's] awareness 'of the wrongfulness . . . of [one's] conduct.' " (*Kevin P.*, at p. 193.) Positive factors such as "normal cognitive functioning" or intelligence by itself "do not affirmatively demonstrate criminal sophistication." (*Ibid.*) But they can support finding this criterion "weighs in favor of transfer to the extent [the positive factors] fail to mitigate other evidence that does affirmatively demonstrate criminal sophistication." (*Ibid.*; see *In re J.S.* (2024) 105 Cal.App.5th 205, 214 (*J.S.*) ["There was little to no indication [the minor] suffered from any intellectual deficits. While in custody, [the minor] was able to finish high school and had taken college level courses"].)

In assessing this criterion, the juvenile court stated: "[T]he analysis of this criteri[on] is the same under either temporal perspective, as it is fixed to the time of the events of the commission of these crimes.

"[F.S.] was 16 years, 7 months old at the time of the offense. [H]e demonstrated typical maturity of a person his age with features of heightened maturity. For example, being recognized as generally affable and well liked by his teachers, being an easy student to work with, and being elected student body president.

22

"The record reflects that [F.S.] was a capable student without any notable education needs or interventions. No Individualized Education Plan was ever noted in the records. He maintained straight As at North County School, close in time to the [underlying offenses], and completed his high school education while at Table Mountain School while detained at the juvenile hall awaiting trial and sentencing during the original criminal proceedings. No physical limitations or disabilities have been noted. There is no direct evidence that [F.S.] suffered any mental or emotional health problems.

"As to impetuosity and appreciation of risks and consequences, the Court also evaluates contemporaneously the effect of familial and peer pressure on [F.S.'s] actions. And I find that in this particular scenario, those are overlapping. And much of the evidence that the Court considered here leads to the same conclusions.

"[F.S.] was the youngest sibling in a family of four boys and one girl. The evidence in the record shows that each sibling had exposure to the juvenile or criminal justice system prior to [F.S.'s] conduct at issue here.

"[F.S.] was aware of criminal intervention in his family and his life, having been granted Deferred Entry of Judgment on a . . . Section 602 Petition previously, and then having that revoked and being declared a ward of the juvenile court. He was aware of consequences of criminal behavior as he had been detained and had been advised of the possible consequences on prior Petitions. He was also aware of the consequences of criminal behavior based upon his vicarious experience with his siblings.

"I will note that in reviewing the juvenile court file, it was a common theme of [F.S.'s] parents' complaints and comments during his prior . . . juvenile proceedings that the juvenile and criminal justice system were harassing their family and [F.S.]. In other words, the Court found that they were of the opinion that the interventions were unwanted or unwarranted.

"In a parallel observation during many of those same reports, [F.S.'s] parents lamented [his] participation in criminal street gangs and expressed hope that, unlike his

23

older brothers, [F.S.] would avoid participating in gang behaviors and conduct. Of note, [F.S.'s] father indicated that he would exercise additional supervision and make his best effort to divert [F.S.] from the gang lifestyle, and that his father believed that . . . would be sufficient to accomplish that goal. This demonstrated to the Court that the issue of gang involvement was recognized as a problem within the family and was, at least, intended to be addressed.

"The participation of [F.S.'s] brothers in gang activities influenced [him] negatively toward participation. That's obvious. But it also magnifies his appreciation of the risks, as he was aware specifically of his [older] brother [L.] being prosecuted and convicted of a stabbing and subsequently being sent to state prison.

"[F.S.] participated in gang activities with his brothers, in concert with his brothers, and was involved directly with [M.] in this incident, as well as prior incidents, one being a gang-motivated battery.

"[F.S.] was discouraged from participating in gang activities by his brother [L.] after [L.] was convicted of a stabbing.

"During the event [(i.e., the underlying altercation)], [F.S.] escalated the circumstances despite efforts by at least one other in his group . . . encourag[ing] him not to engage in the fight.

"[F.S.] attempted to move the victims to a position where video evidence would not be possible, demonstrating premeditation.

"[F.S.] exhibited express malice by stating he was going to kill the victims as he stabbed . . . Semore and . . . [W.C.].

"Further, the Court finds the method and application of force and the specific areas of the body that [F.S.] stabbed the victims demonstrated a gravity of purpose consistent with his stated intent. [F.S.'s] multiple plunges of the knife into the chest of . . . Semore, where the forensic evidence shows [F.S.] maintained the knife in the wound but thrust it

24

at different angles, shows sophisticated intent to mortally injure Semore.  [F.S.'s] stabbing of . . . [W.C.] in the face demonstrates significant callousness.

"Subsequently, [F.S.] disposed of the knife and burned his clothing.  [F.S.] denied participation and asserted an alibi that also gave cover to his brother [M.].

"In consideration of the effect of [F.S.'s] family and community involvement on his criminal sophistication, . . . [F.S.] was brought up in a household where his brothers participated in gang activities and had law enforcement intervention.  [F.S.] also had extended family and participated in events with cousins, in particularly the Cortes side of the family.  He worked at Taco de Cortes and spent time at the Cortes Ranch doing chores.

"[F.S.] also actively engaged in the immediate community where he lived, participating in Team Chapman, recreational sports as a younger youth, and socializing at the Dorothy Chapman Community Center.

"[F.S.'s] peer group did include others who participated in gang activities.  There is evidence that educational figures made efforts to dissuade [F.S.] from participating in gang activities, yet [F.S.] persisted in his desire to associate with a gang.  And, in fact, espoused to David . . . [(a principal and high school teacher)] the idea that he would be the first person [David knew] that would both 'bang' and graduate from college as an engineer.

"As to the criteria involving suffering trauma, in hindsight, there is some suggestion of trauma suffered by [F.S.] affecting his mental and emotional health.  This Court does not find that that has been established in any meaningful way such that this Court can consider it in a positive or negative way . . . affecting [F.S.'s] criminal sophistication.  The Court notes that [F.S.'s]  asserted unreported sexual victimization by a neighbor likely had negative impacts on him.  That would be obvious.  But those are nebulous here, and the Court finds no nexus to any analysis of his criminal sophistication.

"As to this factor, the Court finds that [F.S.] demonstrated heightened criminal sophistication similar to and exceeding that of many adult offenders. This factor weighs heavily in favor of transfer."

F.S. argues there was insufficient evidence to support the juvenile court's "theory" of criminal sophistication, which was based on the court's "assumption" that he intended to kill Semore and that he "persisted in his desire" to "become gang involved." As support for his position, F.S. claims the expert evidence he offered was to the "contrary." F.S. further claims there was "significant mitigating evidence" regarding "the subcriteria of impetuosity or failure to appreciate risks and consequences of criminal behavior, the effect of familial, adult, or peer pressure on [F.S.'s] actions, the effect of [F.S.'s] family and community environment and the existence of childhood trauma." According to F.S., the juvenile court's evaluation of the criminal sophistication criterion "doesn't mention any of that, whereas the defense experts covered it all," and there was no substantial evidence to "refute the defense showings with respect to the criminal sophistication category."

We are unpersuaded, as F.S. simply cites certain defense evidence in support of his position and based thereon, makes arguments more appropriately directed to a trier of fact than to an appellate court. In a substantial evidence challenge, an appellant cannot carry his burden on appeal by merely rearguing the "facts" and/or reasserting his position at trial. Instead, the appellant must lay out the evidence favorable to the other side and show why it is lacking. F.S.'s failure to do so here is fatal to his claim. (*Defend the Bay, supra*, 119 Cal.App.4th at p. 1266.) It is not our role to independently review the record to make up for F.S.'s failure to carry his burden. (*Ibid*.)

In any event, we have reviewed the record and find that it includes substantial evidence supporting the challenged finding. Among other things, there was evidence showing that F.S. had normal cognitive functioning, no physical, mental, or emotional health issues, no maturity issues other than being a typical 16 year-old, and no pattern of

26

impulsive behavior or impetuosity. There was also evidence showing an increasing seriousness (or escalation) in F.S.'s criminal behavior (which included a pattern of gang-related violence/fights), and that F.S. understood the consequences of his criminal behavior and gang involvement because his older brothers were gang members and one of them had been sentenced to prison for stabbing multiple people with a knife. Further, there was evidence indicative of criminal sophistication on the part of F.S. during the commission of the underlying offenses--e.g., numerous deliberate stabbings of two victims in vulnerable areas after directing one victim to move away from a surveillance camera--and thereafter with his efforts to avoid detection--e.g., lying about his involvement in the altercation, disposing of the knife, burning his clothing. (See *J.S.*, *supra*, 105 Cal.App.5th at p. 214 [minor's deliberate violent conduct, which had progressed from robbery to robbery with a knife to murder with a knife, denial of any involvement in the murder, and attempts to conceal evidence reflected criminal sophistication]; *Kevin P., supra*, 57 Cal.App.5th at p. 194 [a minor's attempts to avoid detection, including setting fire to a body and an apartment, "constitute[d] substantial evidence of a certain degree of criminal sophistication"].) And, contrary to F.S.'s contention, the record reflects that the juvenile court considered the relevant factors in determining that the criminal sophistication criterion weighed "heavily" in favor of transferring the matter to adult criminal court. To the extent F.S. requests that we conduct an independent review of the record and make our own determinations as to the weight of the evidence, he misconstrues and/or misapplies the substantial evidence standard of review and we decline to do so. (*Defend the Bay, supra*, 119 Cal.App.4th at p. 1266.) Finally, we reject F.S.'s suggestion that the juvenile court erred by assuming he intended to kill Semore. It is well settled that a juvenile court must assume the minor committed the underlying offenses for purposes of the transfer hearing analysis. (*Jones, supra*, 18 Cal.4th at p. 682.) Moreover, the evidence adduced at trial showed as much.

## 2. *Rehabilitation Prior to Expiration of Juvenile Court's Jurisdiction*

The second statutory criterion is "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction." (§ 707, subd. (a)(3)(B)(i).) In evaluating this criterion, the court must consider "the minor's potential to grow and mature." (*Id*., subd. (a)(3)(B)(ii).) The focus "is whether there is enough time to rehabilitate the minor while the minor is still eligible to remain under juvenile court jurisdiction." (*Miguel R*., *supra*, 100 Cal.App.5th at p. 166.)

The parties may introduce expert testimony specifically addressing "the availability of treatment programs in the juvenile court system and the amenability of the minor to those programs." (*J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 721 (*J.N.*).) Expert witnesses can provide "guidance" for the juvenile court in making its determination, and expert opinion testimony "that the minor can be treated by those facilities is entitled to great weight in the court's ultimate determination." (*Jimmy H. v. Superior Court* (1970) 3 Cal.3d 709, 714-715.) However, the "decision rests in the sound discretion of the juvenile court," and an expert opinion that a minor is amenable to treatment "is not conclusive." (*Id*. at p. 715; see *J.S., supra*, 105 Cal.App.5th at p. 212 [juvenile court was not bound by defense expert's testimony and opinion that minor "could be timely rehabilitated"]; *J.N.*, at pp. 721-722 [" 'In those cases where the juvenile court might decide treatment as a juvenile would be in the minor's best interest, the court could still find the minor "unfit *if* those experts testified that rehabilitation might require treatment beyond the date of his mandatory discharge' "].)

In assessing the rehabilitation criterion, the juvenile court began its analysis by noting that it would evaluate the criterion from two "distinct temporal perspectives," including from the time period prior to trial, that is, when a transfer hearing typically occurs. (§ 707, subd. (a)(1).) With respect to that "temporal perspective," the court stated: "As to a contemporaneous evaluation, the Court pauses to note that the events that occurred at [prison] precipitating [F.S.'s] disassociation with the prison gang, to wit,

28

[F.S.] being confronted with the possibility of being ordered to exact violence upon his brother [L.], would not have happened and no likely analogous scenarios could have occurred had [F.S.] originally remained within the jurisdiction of the juvenile court and been committed to the Department of Juvenile Justice.[12]  In any case, it would be speculative to assume any such event would have occurred or would have had any effect on [F.S.'s] relationship to gangs.

"Here, the Court would have had jurisdiction over [F.S.] until he was aged 25, or for approximately 8 years from the time of the commission of these offenses, assuming that there was a commitment to the Department of Juvenile Justice.

"The evidence of [F.S.'s] behavior and demeanor at or near the time of the offense demonstrates that he was making conscientious decisions and choices to participate in gang activity and criminal conduct, and that that was in disregard of other contrary influences at school, in the community, . . . and through contact with the probation department while he was under supervision."  (Fn. added.)

After the juvenile court explained why it would give "no weight" to certain testimony from an expert prosecution witness,[13] it continued:  "[T]he Court finds that as a . . . 16-year, 7-month old, while there was some clear indication that [F.S.] had potential in life and potential for change, [F.S.] could not have been rehabilitated prior to the expiration of the Court's jurisdiction.

"The Court notes that during the course of evidence during this proceeding much attention was paid to [F.S.'s] behavior . . . once he was committed to the Department of Corrections.  And, again, as I noted, it's impossible to know whether or not those same

---

[12]  The record reflects that F.S. dropped out of the Norteño street gang in March 2008.

[13]  The expert testimony concerned the concept known as "life-course persistent" offenders, who are individuals who exhibit a pattern of antisocial behavior that begins in childhood and continues into adulthood.

things would have occurred.  But what I will say is I do believe [F.S.] is a redeemable person and someone that has the ability to make change, but it is my conclusion, based upon the record as it would have existed at the time of the commission of these offenses, or shortly thereafter, that [F.S.] would not have been capable of being rehabilitated within the eight or so years available to the Court."

As for the alternative "temporal perspective," the juvenile court stated:  "Shifting to a present-day evaluation, this criteria appears to be the most compelling in favor of [F.S.'s] request, and in favor of retaining jurisdiction.  Here, the Court presumes the ability to commit [F.S.] to the Commitment to Success Program[, which is] the . . . Butte County Probation Department's version of a Secure Track Youth Facility,[14] and in that two-year period of control that I mentioned earlier.

"The evidence of progress that [F.S.] has made over the past 17 1/2 years cannot be ignored and should not be minimized.  It's significant.  The Court has [been] presented [with] a person who is different than the 16-year-old version of [F.S.].  To a degree, that's to be expected and to be hoped for anyone who has experienced those circumstances that [F.S.] has, and the circumstances that he finds himself in after his own conduct.  To put it

---

14 Commitment to the Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ) used to be " 'the state's most restrictive placement for its most severe juvenile offenders.' " (*In re M.B.* (2024) 99 Cal.App.5th 435, 448.)  However, "in 2020 the Legislature passed 'juvenile justice realignment' through Senate Bill No. 823 (2019-2020 Reg. Sess.) (Stats. 2020, ch. 337)." (*In re J.B.* (2022) 75 Cal.App.5th 410, 413, fn. 3.)  The purpose of the juvenile justice realignment was "to reduce the number of juvenile offenders housed in state facilities by shifting responsibility to the county level ' "for all but the most serious youth offenders." ' " (*In re D.B.* (2014) 58 Cal.4th 941, 948.)

As part of the juvenile justice realignment, Senate Bill No. 92 (2021–2022 Reg. Sess.) added section 875, which became effective on May 14, 2021. (Stats. 2021, ch. 18, § 12.)  Section 875 allows for youth offenders who would have been committed to the DJJ to instead be committed to a secure youth treatment facility. (See *In re Tony R.* (2023) 98 Cal.App.5th 395, 406.)

simply, he is in a better place to be rehabilitated now than he was as a 16- or 17-year-old young person.

"However, the Court is not persuaded that [F.S.] is presently rehabilitated, or habilitated, as some of the experts opined. The Court finds that he has much yet to establish himself as a trusted and safe member of society. And I also recognize in saying that, that it is difficult to establish oneself as a trusted and safe member of society from within the confines of the Department of Corrections, but those are the circumstances with which we are presented.

"The Court notes that during the testimony, the premise of intrinsic versus extrinsic change had been testified to by both parties' witnesses and on cross-examination. I find that the opinions expressed in support of the conclusion that [F.S.] has demonstrated intrinsic change are largely presumptuous. There's no direct evidence of that. I think that those conclusions are based in optimism in the human spirit and in good faith. I don't think that the witnesses testified inappropriately, but I do believe that their conclusions are not based in any evidence that's been presented to the Court.

"For example, I will point out that the suggestion that [F.S.] disassociated with a gang was an intrinsic change is belied by the reality that it was in the context of the prospect of having to attack his brother. That is not [F.S.'s] fault. That is what happened. It is a simple fact that that is what precipitated his choice to disassociate, and that's how it came to bear. But from a scientific or evidentiary analysis, I cannot conclude that that was an intrinsic change. In fact, I will say it weighs more heavily in the category of extrinsic pressure.

"Evidence of [F.S.'s] conduct at the Department of Corrections after . . . his removal to a Secured Needs Yard [(following his dissociation from the Norteño street

31

gang in 2008)] suggests, however, that there was not an intrinsic change because of ongoing rules violations that were serious and frequent.[15]

"Whether [F.S.] had now intrinsically made that change is more likely. There is evidence to support that conclusion, in that there has been a significant period of time where [F.S.] has resided within the Department of Corrections without significant rules violations. But even that must be considered in light of the change of his status as a prisoner without the real possibility of parole to being ensured at least an opportunity of that after his resentencing in November of 2016. Thereafter, there was a notable focus on programming and self-improvement, and commendable efforts in that regard.

"The Court was also persuaded that prior to that change of status, access to those opportunities at the Department of Corrections would likely have been limited, if not completely unavailable, to [F.S.] as a prisoner . . . serving a life without the possibility of parole sentence.

"The Court is concerned that the efforts and presentation of [F.S.'s] attitude toward rehabilitation are self-interested based on the goal of being released from custody, though I will note that, as with anything in life, doing what is best for a reason that may not be the best reason is still doing what is best. And so I do commend [F.S.] for his efforts at self-improvement programming. They are persuasive here in regard to this factor.

"I do find that [F.S.] has yet to fully take accountability for his actions and continues to minimize his role in the death of . . . Semore and assault of . . . [W.C.]. That, to my mind, necessitates additional rehabilitative services where [F.S.] could be

---

**15** After F.S was placed in the secured needs yard following his decision to turn in a weapon and drop out of the Norteño street gang in 2008, he was cited for the following rules violations: fighting (December 2010); fighting (April 2014); participation in a riot (May 2014); possession of alcohol (March 2015); battery (September 2015); and fighting (July 2016).

directed to be more accountable, which in this Court's opinion, would improve the quality and genuine effect of any empathetic attitude he would have, which this Court believes is necessary to determine someone has truly been rehabilitated.

"The Court is concerned that the programming available . . . for [F.S.] through the Commitment to Success Program would need significant revision in order to address his particular needs at this point of life in light of his age and his circumstances being so different from the typical minor that is committed to that program. Because of that concern and the truncated period of time, that being only two years, the Court is also concerned that the effort of rehabilitation may not be successful because the Court simply does not have the time, and Probation doesn't currently have the programming, that would serve [F.S.] best.

"That being said, that does not cause this Court to conclude that that is not a viable option as far as a disposition should [F.S.] be retained within the jurisdiction of the Court. In fact, to the contrary, the Court's point here is that if that were the order, the Court would be directing the probation department to engage in significant services that would be necessary for [F.S.] to be successful in achieving rehabilitation.

"Under the temporal perspective of the current evaluation, considering all of the passage of time and the changes that [F.S.] has demonstrated, the Court finds that now, as a 34-year-old man, he might be rehabilitated prior to the expiration of the Court's jurisdiction.

"Under the contemporaneous analysis, the Court finds that this factor weighs strongly in favor of transfer. That being the analysis of [F.S.] as a 16-year-old, 7-month.

"Under the present-day analysis, the Court finds this factor weighs marginally in favor of retention of [F.S.] in the juvenile court." (Fn. added.)

F.S. argues the juvenile court erred in rejecting the testimony of his experts, who opined that he could be rehabilitated prior to the expiration of the juvenile court's jurisdiction (i.e., within two years), including testimony that he had demonstrated

33

intrinsic motivation to change by (among other things) showing remorse for his crimes and successfully completing various rehabilitative programs while incarcerated. F.S. adds that the People submitted "no substantial evidence on this subject."

As an initial matter, we note that F.S. offers no authority in support of his contention that the transfer analysis in this case includes consideration of whether he (an adult for more than 15 years) was *currently* able to be rehabilitated prior to the expiration of the juvenile court's jurisdiction (here, two years). As we have discussed, under the circumstances presented, our Supreme Court has endorsed a specific remedy: "When conducting the transfer hearing, the juvenile court shall, to the extent possible, treat the matter as though the prosecutor had originally filed a juvenile petition in juvenile court and had then moved to transfer [the minor's] cause to a court of criminal jurisdiction." (*Lara, supra*, 4 Cal.5th at p. 310.)

Applying this remedy, the juvenile court found that F.S. could not have been rehabilitated prior to the expiration of juvenile court's jurisdiction. In so finding, the court pointed to F.S.'s behavior and demeanor at or near the time of the underlying offenses (which demonstrated that he was making conscientious decisions and choices to participate in gang activity and criminal conduct), and F.S.'s "disregard" of other contrary influences at school, in the community, and the probation department.[16] The court also found that F.S. had yet (at age 34) to take full accountability for his actions and continued to minimize his role in the underlying altercation, including his role in the

---

[16] At the transfer hearing, the juvenile court permitted Anthony Urquiza, Ph.D., in clinical psychology, to testify as an expert for the People about psychology, effects of trauma on juveniles, and juvenile mental health. After reviewing various materials (e.g., juvenile court records, probation reports, police records, prison records, defense expert reports) Dr. Urquiza opined that, based on F.S.'s strong gang association and his continuous pattern of violent and defiant behavior (including while in prison), it would have been "very difficult" to successfully rehabilitate F.S. by the time he turned 25 years old.

34

death of Semore and the assault of [W.C.]. In the court's view, this showed that F.S. had not been rehabilitated at the time of the transfer hearing, even though there was evidence that F.S. had made "commendable efforts" at "self-improvement programming" following his resentencing in 2016, which granted him the possibility of parole.

F.S. does *not* raise a substantial evidence challenge to the juvenile court's finding that, had the People moved to transfer the case to a court of criminal jurisdiction prior to trial in 2007, he could not have been rehabilitated before the expiration of the juvenile court's jurisdiction (i.e., before he turned 25). Instead, F.S. claims reversal is required because the People presented no evidence as to why his "rehabilitative needs couldn't [currently] be met in a 2-year control period juvenile court commitment." But, as we have noted, F.S. offers no authority holding that this is the proper standard to assess the rehabilitation criterion under the circumstances presented, and it is not.

The cases on which F.S. relies--*Kevin P., supra*, 57 Cal.App.5th 173 and *J.N., supra*, 23 Cal.App.5th 716--are distinguishable. Unlike here, neither *Kevin P.* nor *J.N.* involved a transfer hearing that occurred more than 15 years after the minor was convicted and had reached the age of majority. (See *Kevin P.*, at pp. 184, 198 [transfer motion filed contemporaneously with section 602 petition; the minor was 18 years old at the time of the transfer hearing]; *J.N.*, at pp. 710 & fn. 1, 712-713 [matter set for transfer hearing approximately one year after felony complaint was filed; the minor was 19 years old at the time of the transfer hearing].) And, in any event, even if we assume for the sake of argument that F.S. has identified the proper standard to evaluate the rehabilitation criterion in this case, the juvenile court found that the criterion, in that context, weighed "marginally in favor of retention of [F.S.] in the juvenile court." In other words, the juvenile court already found that this criterion weighed *against* transfer to a court of criminal jurisdiction *without* applying the standard F.S. urges us to require.

F.S.'s argument thus appears to be that the juvenile court erred by failing to find the rehabilitation criterion weighed *more strongly* against transfer to a court of criminal

35

jurisdiction.  As support for his position, F.S. relies on the testimony of several defense experts, who opined that he was currently rehabilitated or could have been rehabilitated prior to the expiration of the juvenile court's two-year jurisdiction, and the absence of any contrary evidence.  The juvenile court, however, was not required to credit the testimony of the defense experts.  (*J.S., supra*, 105 Cal.App.5th at p. 212; *In re Alejandro G.* (2012) 205 Cal.App.4th 472, 480 (*Alejandro G.*).)  And the court did not abuse its discretion by relying on other evidence in the record, including the testimony of the People's expert (Dr. Urquiza), who opined that it would have been "very, very difficult" for F.S. to be rehabilitated within the two-year period the juvenile court could exercise jurisdiction over him.  In support of his opinion, Dr. Urquiza noted that while F.S. had completed some courses while incarcerated and had renounced his gang affiliation, F.S. did not "complete[d] a lot of different types of services or courses that [Dr. Urquiza] would expect."  Dr. Urquiza added that, aside from the gang affiliation renouncement, he did not see "any demonstrated substantial changes of behavior," as F.S. continued to "persist in aggression and fighting" while incarcerated.  Dr. Urquiza, however, acknowledged that F.S. did not have any recent incidents of aggression (i.e., incidents within the past four years).

As for the rehabilitative services that were available to F.S. if he were under the jurisdiction of the juvenile court, a probation officer testified that, due to his age (nearly 34 years old),[17] the available programs (as detailed in the juvenile court transfer report) would not be appropriate for F.S. "as they are geared toward youth," and there would be

---

[17]  F.S. was 33 years old at the time the probation officer testified at the transfer hearing. He turned 34 years old before the conclusion of the hearing, which spanned multiple days in February and March 2023.

"problems housing and supervising [him]."[18]  The probation officer also noted that, in connection with her preparation of the juvenile court transfer report, she interviewed F.S. on two separate occasions in September 2022.  During those interviews, F.S. claimed that he never intended to kill anyone, that due to his "gang status" he "couldn't go back" (i.e., walk away from the fight) after "gang signs were thrown" by Semore (murder victim), and that "he didn't know what he was doing [during the altercation], he was just reacting."  F.S. also claimed that, prior to the stabbings, he was "afraid" [W.C.] (the attempted murder victim) had a weapon because [W.C.]'s hand was behind his back and [W.C.] claimed he had killed someone earlier that night.

In a May 2022 handwritten letter titled, "The Crime," F.S. provided a detailed description of what happened before, during, and after the underlying altercation.  As for the murder victim, F.S. claimed that he only stabbed Semore once in the stomach after one of his companions ([S.J.R.]) stabbed Semore with "an uppercut motion."  Thus, because the evidence at trial showed that Semore did not die from a stab wound to his stomach, but rather from multiple stab wounds to his chest and back (including his heart) (*Siordia*, *supra*, C055282, at p. *2), F.S. was effectively claiming that he was not the actual killer.  In doing so, F.S. contradicted the statements he made during his police interview, including his admission that he "could have got" (i.e., stabbed and/or slashed) Semore "a thousand times" with the knife.  (*Ibid.*)

Substantial evidence supports the challenged finding as to the rehabilitation criterion.  We reject F.S.'s suggestion that the juvenile court abused its discretion by not finding that this criterion (when assessed from a contemporary perspective) weighed

---

[18]  The probation officer's juvenile court transfer report identified and described the various programs that were currently available to youth offenders in Butte County, such as moral reconation therapy, which is a cognitive-behavioral treatment strategy that aims to enhance self-image, promote growth of a positive productive identity, and facilitate the development of higher stages of moral reasoning.

37

more strongly against transfer to a court of criminal jurisdiction. F.S.'s argument amounts to a disagreement as to how the juvenile court weighed conflicting evidence. The juvenile court resolves conflicts in the evidence and determines the facts, and we may not usurp the fact finder's role by reweighing the evidence on appeal. (*People v. Nelson* (2011) 51 Cal.4th 198, 210; *People v. Young* (2005) 34 Cal.4th 1149, 1181.) The juvenile court was not required to credit the opinions proffered by the defense experts or weigh evidence regarding the rehabilitation criterion in the way the F.S. preferred. (See *Alejandro G.*, *supra*, 205 Cal.App.4th at p. 480 [the fact that the court's finding conflicted with two experts' opinions did not show a lack of substantial evidence because the court is not obligated to adopt the experts' opinions].) Nor was the court required to accept F.S.'s description of what happened before, during, and after the underlying altercation (as set forth in his May 2022 letter). The court did not abuse its discretion by relying on the other evidence in the record, including the evidence adduced at trial that was inconsistent with F.S.'s version of events.[19]

---

[19] F.S. argues that "neither the 'official' prosecution version based on the evidence before the jury, nor [F.S.'s] failure to match his account to that version, should be deemed substantial evidence in support of [F.S.] being unamenable to rehabilitation." In F.S.'s view, the juvenile court's conclusion that "the differences between [his] account (in which he was not the killer) and the evidence before the jury that convicted him (in which he was the killer) should reflect adversely on [him] is unsupported by substantial evidence." This is so because the People violated *Napue v. Illinois* (1959) 360 U.S. 264 and *People v. Westmoreland* (1976) 58 Cal.App.3d 32, by failing to correct materially false and misleading testimony from the lead detective; specifically, the testimony that F.S. said during his police interview that he could have "gotten" (i.e., slashed and/or stabbed) Semore "a thousand times." F.S. has forfeited this claim by raising it for the first time in this appeal, filed more than 14 years after we issued our unpublished decision affirming his convictions in 2009. (*Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 603.)

In any event, the claim has no merit. F.S. has not shown that the lead detective testified falsely or in a misleading manner, let alone that the People knowingly used false or misleading testimony to obtain a conviction. (See *Napue v. Illinois, supra,* 360 U.S. at p. 269 ["a conviction obtained through use of false evidence, known to be such by

38

### 3. *Previous Delinquent History*

The third statutory criterion directs the juvenile court to consider the "minor's previous delinquent history" and, when doing so, to "give weight to any relevant factor, including, but not limited to, the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior."  (§ 707, subd. (a)(3)(C)(i)-(ii).)  Juvenile courts enjoy "broad discretion to consider all evidence relevant to this inherently case-by-case determination," including all forms of delinquent behavior.  (*D.C., supra*, 71 Cal.App.5th at p. 455; see *id*. at p. 456 [the juvenile court considered of the minor's "behavior documented in his school records"]; *J.S., supra*, 105 Cal.App.5th at pp. 214-215 [the juvenile court considered the minor's " 'significant school delinquency' history starting in the seventh grade, including poor behavior, suspensions, and multiple attempts by school officials to rehabilitate [the minor]"].)

In evaluating this criterion, the juvenile court stated:  "[T]he Court finds that the analysis of this criteria is the same under either temporal perspective, as . . . it is fixed in time to the events [prior to trial in 2007].

"The Court will note that [F.S.'s] experts uniformly testified from a position of unfamiliarity with, or ignorance of, the actual juvenile court records in this matter.

---

representatives of the State" violates due process under the Fourteenth Amendment to the United States Constitution, and "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears"]; *People v. Morrison* (2004) 34 Cal.4th 698, 716-717 ["the prosecution has the duty to correct the testimony of its own witnesses that it knows, or should know, is false or misleading"; " 'a prosecutor's knowing use of false evidence or argument to obtain a criminal conviction or sentence deprives the defendant of due process' "]; *People v. Westmoreland, supra*, 58 Cal.App.3d at p. 42 ["a denial of due process can result if the prosecution, although not soliciting false evidence, allows a misleading and false impression to go uncorrected when it appears"].)

"The Court finds that there is a clear pattern of increasing seriousness in gang-related prior delinquent behavior. The Court notes [F.S.'s] theft crimes are typical of a wayward youth, but with a distinct feature that he continued to engage in criminal behavior after intervention by Probation and his school in regard to those thefts. In particular[], [F.S.'s] April 22nd, 2003, gang-related battery on two victims in the presence of one of the victim's father and amongst a large group of [F.S's] peers, some of whom were believed to be gang members or associates, foretold a willingness to exact violence very similar to the facts of the instant offense, with a notable and fortunate absence of a knife being used.

"The Court, in review of the record, finds that there were other similar assaultive behavior that was reported while at school and as violations of his wardship. The Court finds that this factor weighs in favor of transfer to the court of criminal jurisdiction."

F.S. argues reversal is required because there is no evidence showing how his behavior between the ages of 14 and 16--fighting in a public place (school) in 2003, gang-related felony battery on two victims in 2003, petty theft in 2004, and possession of marijuana and gang-related fight at school in 2004[20]--related to his capacity for rehabilitation at the time of the transfer hearing when he was 34 years old and had long since renounced the "gang lifestyle." According to F.S., "[s]uch linkage" was required and had to be supported by evidence.

We are unpersuaded. As we have explained, where (as here) the juvenile court is presented with a postjudgment request for a determination of whether a minor (now an adult) was properly tried as an adult years earlier, the previous delinquent history

---

[20] F.S. was on probation at the time of the murder and attempted murder in October 2005. Less than a month later, F.S. was expelled from school for a gang-related fight. The next day, F.S. was at a "gang party" where one of his brothers was shot in the chest. This conduct formed the basis for alleged violations of F.S.'s probation.

criterion requires the juvenile court (as it did here) to assess the minor's delinquent history at the time the People should have filed a transfer motion (i.e., prior to trial). F.S. cites no authority persuading us that the juvenile court improperly evaluated this factor, including any case law supporting his contention that the previous delinquent history criterion encompasses conduct by a minor years after the minor has been convicted and reached the age of 18.[21] And, having independently researched the matter and reviewed the record, we see no error in the juvenile court's analysis or basis to reverse for insufficient evidence. Substantial evidence supports the juvenile court's finding that the previous delinquent history criterion weighed in favor of transfer to a court of criminal jurisdiction.[22]

### 4. *Previous Attempts at Rehabilitation*

The fourth criterion requires the juvenile court to consider whether the "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor" weighed in favor of transfer. (§ 707, subd. (a)(3)(D)(i).) When evaluating this criterion, the juvenile court must "give weight to any relevant factor, including, but not limited to, the adequacy of the services previously provided to address the minor's needs." (*Id*., subd. (a)(3)(D)(ii).)

In assessing this criterion, the juvenile court stated: "[The] Court finds that the analysis of this criteria is the same under either temporal perspective, . . . as it is fixed in

---

[21] Indeed, the term "delinquent history" generally refers to a person's criminal or antisocial behavior that occurred before the person reached the age of majority (i.e., 18 years old).

[22] We reject F.S.'s suggestion that the juvenile court erred in finding that the defense experts were unfamiliar with his juvenile court records. The record discloses that three of the four defense experts expressly testified that they did not review the records and the fourth testified that she "believe[d]" she reviewed the records but could say "for sure" whether she did so.

time to the events [prior to trial]. And . . . the Court notes that [F.S.'s] experts were largely uninformed or misinformed as to the criteria here.

"The Court finds the obvious, that prior efforts to rehabilitate [F.S.] were unsuccessful. However, the Court finds that the efforts and services offered [to him] were robust, including at times bi-weekly meetings by the probation officer with [F.S.] and his family. During certain windows of time, it would appear that [F.S.] was compliant with the conditions of his supervision while under the jurisdiction of the juvenile court, yet at no point is there evidence of any marked change of attitude or behavior by [F.S.] leading up until the events that bring him before this Court.

"During the course of informal handling, Deferred Entry of Judgment and formal wardship supervision, the probation department recognized and discouraged gang participation with [F.S.] and had conversations with his parents about the problematic associations. [F.S.] did not deviate from his associations.

"It is . . . obvious, in hindsight, that the services offered did not detract [F.S.], but the Court concludes the services offered were adequate and appropriate. [F.S.] and his family did not take advantage of them.

"The Court will note one point of criticism of the tenor of several probation reports, which is that [F.S.] was often considered in context of his brothers rather than being assessed more individually. The Court would have liked to have seen [F.S.] be encouraged with and empowered to believe he was not predestined to be another member of the Siordia gang family, but I did not find that in the record.

"In conclusion, the Court finds that this factor weighs in favor of transfer of jurisdiction."

F.S. does not argue there was any evidence showing that the previous attempts to rehabilitate him were successful. Instead, he claims the attempts at rehabilitation were inadequate, and there is no substantial evidence supporting the juvenile court's finding that he received "robust" rehabilitative services. The evidence presented at the transfer

hearing, in F.S.'s view, showed that his parents and other family members were not active participants in his "rehabilitative efforts," that he received minimal treatment "related to his overall adolescent behavior," and that neither his school district nor the probation department responded with viable corrective actions or provided interventions such as counseling or mental health evaluations.

Substantial evidence supports the juvenile court's finding that this criterion weighed in favor of transfer to a court of criminal jurisdiction. The record reflects that F.S. engaged in a pattern of delinquent behavior between the ages of 14 and 16, some of which, such as fighting, was gang-related. As a consequence of his behavior, F.S. was referred to a pretrial diversion program (which he successfully completed), granted deferred entry of judgment, and placed on formal probation. As part of his probation, F.S. was prohibited from associating with known gang members and ordered to complete counseling and community service. Although the record does not include evidence as to the specific services offered to F.S. to address his needs,[23] the record supports the juvenile court's finding that previous attempts at rehabilitation had not been successful. The record discloses that F.S. violated the terms of his probation multiple times, including for possessing marijuana and being involved in a gang-related fight at school. After F.S. was expelled from high school for this conduct, he was placed at an alternative high school--Academy of Change. Shortly thereafter, he was expelled for a gang-related fight. The second expulsion occurred less than one month after the altercation that resulted in the death of Semore and serious injuries to [W.C.].

---

[23] When interviewed in 2022 in connection with the juvenile court transfer report, F.S. reported that he participated in the global positioning system program, served time in the juvenile hall, and completed community service hours. He also claimed that he was never provided or referred to any counseling services. The record reflects that F.S. completed 50 of the 150 community service hours ordered by the juvenile court.

On this record, the juvenile court could reasonably find that, despite F.S.'s intellectual capacity, likability among peers at school, and placement on probation, he had no willingness or ability to improve his behavior based on his continued poor conduct, including his failure to disassociate with the Norteño street gang and his continued commission of crimes that were escalating in severity, including gang-related incidents involving violence. The juvenile court was not required to accept a defense expert's opinion that the lack of "an extensive criminal history" and "not many juvenile justice system services" were factors that "favored retention" of the matter in the juvenile system. The juvenile court did not abuse its discretion in disagreeing with the expert's opinion and instead relying on the other evidence before it. (See *J.S., supra*, 105 Cal.App.5th at p. 212 [trial court is not bound by an expert's testimony and opinion]; *Alejandro G., supra*, 205 Cal.App.4th at p. 480 [court not obligated to adopt experts' opinions].)

For the reasons we have explained, we reject F.S.'s contention that reversal is required because "there was no evidence of how the pattern of [F.S.'s] crimes between ages 14 and 16 related to his capacity for rehabilitation when he was age 34 and had long since renounced the gang lifestyle and set himself on a far more positive path in life."

### 5. *Circumstances and Gravity of Alleged Offenses*

The fifth and final criterion, the circumstances and gravity of the offense (§ 707, subd. (a)(3)(E)(i)), "focuses on the offense ' "alleged in the petition" ' [citation], and like the other statutory criteria, it is 'based on the premise that the minor did, in fact, commit the offense.' [Citation.] But the allegation that a minor committed a serious offense, including murder, does not 'automatically require a finding of unfitness.' " (*Kevin P., supra,* 57 Cal.App.5th at p. 189, italics omitted.) When evaluating this criterion, the juvenile court must give weight to any relevant factor, including evidence that, while not justifying or excusing the crime, tends to lessen its magnitude, including, but not limited to, "the actual behavior of the person, the mental state of the person, the person's degree

44

of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development." (§ 707, subd. (a)(3)(E)(ii); *Kevin P., supra,* 57 Cal.App.5th at p. 189.)

In assessing this criterion, the juvenile court stated: "[The] Court finds that the analysis of this criteria is the same under either temporal perspective, as it is fixed in time. In fact, it is specific to the events.

"The Court finds [F.S.] intentionally stabbed two individuals with the intent to kill them, and in association with, if not with the specific intent, to benefit his gang. He made a calculated decision to stab. Notably, from by his own statement reflected in People's Exhibit 2, he was manipulating the knife in his pocket prior to the assault, determining whether to stab the victims. He was directly involved with this offense. In fact, he was the stabber. The harm was great to and unrecoverable from both victims. . . . Semore is no longer with us. He is dead because of [F.S.]. . . . [W.C.] is forever scarred and forever traumatized as a result.

"At the time of the offense, [F.S.] was a sophisticated and volitional actor. Despite the encouragement of a senior gang member not to . . . engage in the fight, he proceeded and advanced violence on distinct and separated victims. He had to move from one to the other in order to complete the stabbings. He was acting rationally, considering the consequences of his actions. And he attempted to mitigate his exposure by avoiding camera detection. He did so without direct coercion by anyone present, and with the ability to deflect any criticism from others had he chosen to retreat because of the encouragement of the other known gang member not to engage at that time.

"In conclusion, the Court finds that this factor weighs heavily in favor of transfer to the court of criminal jurisdiction."

F.S. acknowledges that murder "has the highest level of gravity of any offense," but nonetheless suggests that insufficient evidence supports the juvenile court's finding as to this criterion because a defense expert testified that there were "mitigating factors of

the circumstances surrounding the offense, which included significant peer pressure, events that unfolded quickly, a sense of feeling threatened, family members being involved and [F.S.] being the youngest participant, plus [F.S.'s] documented childhood traumas." According to F.S., this evidence showed that, from "an amenability standpoint, the [murder] was not as serious as one might otherwise be led to believe."

We reject F.S.'s suggestion that the evidence he cites prevented the juvenile court from finding that this criterion weighed "heavily" in favor of transfer to a court of criminal jurisdiction. (See *Kevin P., supra*, 57 Cal.App.5th at pp. 189-190 [rejecting similar claim, explaining that the minor failed to "offer any authority for the proposition that expert testimony—or any other evidence beyond that bearing on what happened during the crime—is required to evaluate this criterion"]; *Alejandro G., supra*, 205 Cal.App.4th at p. 480 [court not obligated to adopt experts' opinions].) The record reflects that the juvenile court considered the relevant factors, and substantial evidence supports the court's determination that the circumstances and gravity of the offenses weighed heavily in favor of transfer to a court of criminal jurisdiction. (See *C.S. v. Superior Court* (2018) 29 Cal.App.5th 1009, 1033-1034 [substantial evidence supported the juvenile's court's findings as to the circumstances and gravity of the offenses criterion because there was evidence that the minor personally and actively participated in an unprovoked gang-related attack, kicked and punched the victim, and stomped on the victim's head and killed him after the other attackers fled].)

For the reasons we have discussed, we also reject F.S.'s contention that reversal is required because the People failed to present evidence "of how the gravity of the offenses when [F.S.] was 16 years 7 months of age related to his capacity for rehabilitation when he was age 34 and had long since renounced the gang lifestyle."

### 6. *Amenability to Treatment as a Juvenile*

As noted, *ante*, a recent amendment to section 707 requires the juvenile court to make an "ultimate" finding that the minor "is not amenable to rehabilitation while under

46

the jurisdiction of the juvenile court." (§ 707, subd. (a)(3); see *Miguel R., supra,* 100 Cal.App.5th at pp. 164, 167.) The court must consider all five enumerated factors and state its reasons for finding the minor to be unamenable to rehabilitation while under the jurisdiction of the juvenile court. (§ 707, subd. (a)(3).)

At the conclusion of the transfer hearing, the juvenile court stated: "In light of the foregoing reasons, the Court, under either [of] the temporal perspectives[,] . . . finds, by clear and convincing evidence, that [F.S.] is not amenable to the rehabilitation while under the jurisdiction of the juvenile court, and he shall be transferred to the jurisdiction of the criminal court." In short, because substantial evidence supports the juvenile court's findings as to each of the five statutory criteria, there is no basis to reverse the court's "ultimate" finding that the People satisfied their burden of proof by clear and convincing evidence that F.S. was not amenable to rehabilitation while under the jurisdiction of the juvenile courts. Accordingly, we will affirm the transfer order.

II

*Remand*

F.S. argues that if we affirm the transfer order, the superior court should be required to conduct a new sentencing hearing in which ameliorative changes to the law can be applied, including Assembly Bill No. 333 (2021-2022 Reg. Sess.), which heightened the standard for proving a gang enhancement and substantially narrowed the definition of "criminal street gang" and, by extension, what it means to "further the activities of the criminal street gang" for purposes of the gang-murder special circumstance in Penal Code section 190.2, subd. (a)(22). (See Pen Code, § 186.22, subds. (b), (e)-(g); *People v. Rojas* (2023) 15 Cal.5th 561, 565-567; *A.M., supra,* 102 Cal.App.5th at pp. 569-570 [noting that Assembly Bill No. 333 imposed "stricter

requirements" to prove a gang-murder special circumstance].)[24]  The Attorney General opposes F.S.'s request for resentencing, arguing he has no right to such relief because his judgment became final in 2017 after he was resentenced in connection with the habeas corpus petition he filed in 2016.  As we next explain, Assembly Bill No. 333 requires us to vacate the true findings on the gang-murder special circumstance and the gang enhancements.

In *Padilla*, our Supreme Court held that even after a judgment has become final, its finality may be "reopened" as the result of a successful collateral attack.  (*Padilla*, *supra*, 13 Cal.5th at pp. 158, 161-162.)  The defendant in *Padilla* was a juvenile who stabbed his mother to death and conspired with a cousin to kill his stepfather.  (*Id*. at p. 159.)  Following a transfer hearing at which he was determined not fit to be dealt with under juvenile court law, the defendant was convicted in adult criminal court and sentenced to life without the possibility of parole.  After his judgment was final, the defendant successfully obtained resentencing on a petition for habeas corpus related to changes in the law affecting juvenile sentencing.  While awaiting resentencing, California voters approved Proposition 57, providing that a juvenile could be tried in adult court only after a transfer hearing.  The trial court did not hold a transfer hearing and again imposed life imprisonment without the possibility of parole.  (*Padilla*, at p. 159.)

The question on appeal was whether the defendant was entitled to a transfer hearing under Proposition 57 because his case became nonfinal once his sentence was vacated in the habeas corpus proceeding.  (*Padilla, supra*, 13 Cal.5th at pp. 158-159.)  Finding no meaningful distinction between sentences rendered "nonfinal" because the

---

[24]  Although the scope of our review is limited to the notice of appeal and order appealed from (*Faunce v. Cate* (2013) 222 Cal.App.4th 166, 170), we find jurisdiction to consider F.S.'s request for resentencing because the superior court reinstated F.S.'s convictions and sentence in connection with the transfer of this matter to adult criminal court.

defendant is undergoing retrial or resentencing and those " 'not yet final on initial review,' " the Supreme Court held that Proposition 57 retroactively applied to the defendant's case. (*Padilla*, at p. 158; see *id*. at p. 162 [explaining that "when the Legislature determines a lesser punishment is appropriate for a particular offense or class of people, . . . [w]e presume the Legislature intends the reduced penalty to be used . . . in all cases in which there is no judgment or a nonfinal one, and in which it is constitutionally permissible for the new law to control"].) The *Padilla* court reasoned that when a new trial or new sentencing hearing is conducted after a collateral attack, the prior judgment is no longer final and an appeal from that new proceeding is part of a direct review of a nonfinal judgment. (*Id*. at pp. 163-164.) Thus, when the defendant's sentence was vacated, the finality of his judgment became nonfinal for purposes of the retroactivity rule announced in *In re Estrada* (1965) 63 Cal.2d 740. (*Padilla*, at pp. 161-162.) And because the judgment was nonfinal, the provisions of Proposition 57 applied to his resentencing. (*Padilla*, at p. 170.) Notably, the court reached this conclusion even though the juvenile fitness question was not an issue raised by the collateral attack and the sentencing court ultimately re-imposed the same sentence. (*Id*. at pp. 184-185 [dis. opn. of Corrigan, J.].)

As we have discussed, this case is not final because it is on direct appeal from a juvenile court transfer order. (See § 801, subd. (a); *Padilla, supra*, 13 Cal.5th at pp. 161-162.) Here, F.S.'s convictions and sentence were conditionally reversed in connection with the juvenile court's granting of his unopposed request for a transfer hearing, which the People concede was effectively a petition for writ of habeas corpus seeking "collateral relief." (See footnote 9, *ante*.) The Attorney General does not dispute that the changes to the law effected by Assembly Bill No. 333 are ameliorative changes that apply retroactively to this case. (See *People v. Rojas, supra,* 15 Cal.5th at pp. 567, 580; *A.M., supra,* 102 Cal.App.5th at p. 569.) And the juvenile court's granting of F.S.'s request for a transfer hearing amounted to a successful collateral attack on the judgment.

49

Indeed, F.S.'s convictions and sentence were conditionally reversed pending a determination of whether transfer to a court of criminal jurisdiction was proper. (See *People v. McKenzie, supra,* 9 Cal.5th at p. 46 ["In criminal actions, the terms 'judgment' and ' "sentence" ' are generally considered 'synonymous' . . ., and there is no 'judgment of conviction' without a sentence"]; *A.M., supra,* 102 Cal.App.5th at pp. 564-566 [treating motion to recall remittitur to seek relief under Proposition 57 as a petition for writ of habeas corpus and finding that the superior court's subsequent conditional reversal of minor defendant's conviction and sentence rendered the case nonfinal for purposes of the *Estrada's* retroactivity rule]; *J.M., supra,* 103 Cal.App.5th at pp. 748-751, 753 [conditional reversal of conviction and sentence in connection with juvenile court transfer hearing constituted a successful collateral attack on the judgment that reopens finality for purposes of *Estrada*].)

Nonetheless, the Attorney General insists that because F.S. did not ask for resentencing in connection with his request for a transfer hearing, he is not entitled to remand for resentencing based on ameliorative changes to the law, since his sentence remained "intact and final." Stated differently, the Attorney General argues that because only the transfer issue was before the juvenile court, F.S.'s convictions and enhancements are final for purposes of *Estrada* may not be "readjudicated." He argues the superior court lacks jurisdiction to "revisit" the "final criminal judgment" because sentencing issues were outside the scope of the juvenile court's transfer proceedings.

This issue was recently decided by our Supreme Court in *People v. Lopez* (2025) 17 Cal.5th 388. There, the high court held that "the superior court had jurisdiction to provide relief under applicable ameliorative laws, such as Assembly Bill [No.] 333, after the case was conditionally reversed and remanded to correct a sentencing error." (*Lopez,* at p. 400.) In so holding, the Supreme Court reversed the appellate court, which had determined that the trial court had no jurisdiction to relitigate the gang enhancements because that issue was outside the scope of the remittitur, as the appellate court had

reversed on direct appeal "solely with respect" to the defendant's sentence and had remanded only for that purpose. (*Ibid*.) As for the meaning of "finality" in the *Estrada* context, the *Lopez* court explained: "The issue here is whether a judgment, or part of it, becomes final for *Estrada* purposes based on an appellate court's affirmance of a conviction, while sentencing issues remain pending before the superior court following remand. The answer is no. A criminal case is only reduced to a singular, final judgment following the conclusion of the entire criminal case or prosecution. Thus, a criminal case in which the sentence is not yet final, including one in which an appellate court has affirmed the conviction and remanded for reconsideration of sentencing-related issues, is not final for purposes of *Estrada*, and the benefits of supervening ameliorative legislation apply retroactively. (*Lopez*, at pp. 392-393.)

In light of *Lopez*, F.S. is entitled to the retroactive benefit of *all* the applicable ameliorative changes to the law (e.g., Assembly Bill No. 333) since the imposition of his original sentence, as the judgment in this case is not final for *Estrada* purposes. (*Lopez v. Superior Court, supra,* 17 Cal.5th at pp. 392-393, 400; see *J.M.*, *supra*, 103 Cal.App.5th at pp. 753, 757-758 [concluding that minor defendant was entitled to the retroactive benefit of all the ameliorative changes to the law where the case was on direct appeal from a transfer order following a postjudgment transfer hearing; reasoning that when the judgment was conditionally reversed, the minor's case became nonfinal for purposes of the *Estrada* rule]; *A.M.*, *supra*, 102 Cal.App.5th at pp. 561, 568-569 [same].)

Here, the jury's findings on the gang-murder special circumstance allegation and the gang enhancements were made prior to the substantive changes to Penal Code section 186.22 effected by Assembly Bill No. 333, and without the benefit of jury instructions that embodied those changes. Where, as here, Assembly Bill No. 333 applies retroactively to a jury's findings regarding a gang-murder special circumstance and gang enhancements, we review for harmless error pursuant to *Chapman v. California* (1967) 386 U.S. 18. (*People v. Sek* (2022) 74 Cal.App.5th 657, 668.) Under *Chapman*, vacating

51

the jury's finding is "required unless 'it appears beyond a reasonable doubt' that the [finding] would have been the same" under current law. (*People v. Tran* (2022) 13 Cal.5th 1169, 1207.) If "there is any reasonable possibility that the error might have contributed to the" finding, vacatur is required. (*People v. Lewis* (2006) 139 Cal.App.4th 874, 887.)

On this record, we cannot find harmless error. (*People v. Cooper* (2023) 14 Cal.5th 735, 742, 746-747 [reversing because trial court's failure to instruct on new substantive requirements brought about by Assembly Bill No. 333 was not harmless beyond a reasonable doubt]; see also *People v. Tran*, *supra*, 13 Cal.5th at pp. 1207, 1209 [finding omissions in jury instructions that did not reflect changes to gang statute implicated Sixth Amendment right to a jury trial and application of harmless error standard of *Chapman*].) To establish a gang enhancement under subdivision (b) of Penal Code section 186.22, the People must prove that the defendant committed a felony "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members." The gang-murder special circumstance applies if a defendant "intentionally killed the victim while [he was] an active participant in a criminal street gang, as defined in subdivision (f) of [Penal Code] [s]ection 186.22, and the murder was carried out to further the activities of the criminal street gang." (*Id.,* § 190.2, subd. (a)(22).) Subdivision (f) of Penal Code section 186.22 defines a " 'criminal street gang' " as a group that engages in a "pattern of criminal gang activity." Since 2022, subdivision (e) of that section has defined " 'pattern of criminal gang activity' " as committing offenses that benefit a gang in a way that is "*more than reputational*." (Italics added.)

At trial, the gang expert did not testify that the murder and attempted murder F.S. committed benefitted his gang in any way that was more than reputational. Indeed, respect and reputation were the only benefit mentioned for this particular incident. The jury similarly was not instructed that it needed to conclude that the murder benefited

F.S.'s gang in a way that was more than reputational to render a true finding on the gang-murder special circumstance. The Attorney General does not assert otherwise.

Accordingly, we will vacate the jury's true findings on the gang-murder special circumstance allegation and the gang enhancements, strike the gang registration requirement, vacate sentence, and remand for further proceedings. On remand, the People shall be given the opportunity to retry F.S. on the gang-murder special circumstance allegation and the gang enhancements, after which the superior court will proceed to a full resentencing hearing. (See *Padilla, supra*, 13 Cal.5th at p. 163 ["once a court has determined that a defendant is entitled to resentencing, the result is vacatur of the original sentence, whereupon the trial court may impose any appropriate sentence"].) If the People elect not to retry the special circumstance finding and enhancements, the court shall conduct a full resentencing hearing.[25]

---

[25] Given our conclusions, we need not and do not address any of the other arguments raised by the parties in their respective appellate briefs. To the extent F.S.'s reply brief raises points that were not presented or adequately developed in his opening brief, we decline to consider those points. (*Westside Los Angeles Neighbors Network v. City of Los Angeles* (2024) 104 Cal.App.5th 223, 234, fn. 8.)

## DISPOSITION

The juvenile court's order transferring the matter to a court of criminal jurisdiction is affirmed.  The gang-murder special circumstance allegation (Pen. Code, § 190.2, subd. (a)(22)) and gang enhancements (*id*. § 186.22, subd. (b)) are vacated, the gang registration requirement is stricken, and the matter is remanded for further proceedings consistent with this opinion.

/s/<br>
Duarte, Acting P. J.

We concur:

/s/
Renner, J.

/s/
Wiseman, J.*

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.